Burke, J. (dissenting).
This appeal presents the constitutionality of the New York State Off-Track Pari-Mutuel Betting Law and the New York City Off-Track Betting Corporation Law, enacted by chapters 143, 144 and 145 of the Laws of 1970. Plaintiffs-appellants appeal from an order and judgment of the Supreme Court, Albany County, which sustained the validity and constitutionality of the off-track betting laws. Passed under a message of necessity from the Governor (N. Y. Const., art. HE, § 14), the instant legislation was enacted pursuant to article I (§ 9) of the State Constitution to provide off-track pari-mutuel betting.
Appellants attack the constitutionality of chapters 143 and 144 on several grounds and raise several constitutional issues. Turning to the most cogent of appellants’ arguments, I find myself in agreement with their contention that the present offtrack betting laws contravene article I (§9) and article VII (§7) of the State Constitution and, therefore, am for reversal. However, in reversing, I would hold that the present statutory scheme is only narrowly unconstitutional.
Article I (§ 9) prohibited gambling “except pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue for the support of government ’ ’. Appellants assert a two-fold violation: (1) the Constitution (art. I, § 9; art. VII, § 7) prohibits *222 local governmental units from extracting revenue from off-track betting, i.e., the State was to be the exclusive beneficiary of the revenue and was to appropriate the money through proper legislative channels; (2) the State does not derive a reasonable amount of revenue as a matter of law.
It is the principal objection of appellants that the language of the Constitution (art. I, § 9) permits only the State to derive revenue from pari-mutuel betting. Therefore, the revenue so derived being State funds to be received in the State treasury, the disbursement of these funds should be appropriated in accord with constitutional requirements (art. VII, § 7). I agree.
At the outset, while I recognize the strong legal presumption favoring the constitutionality of legislation (McKinney’s Cons. Laws of N. Y., Book I, Statutes, § 150; Lincoln Bldg. Assoc, v. Barr, 1 N Y 2d 413; Defiance Milk Prods. Co. v. Du Mond, 309 N. Y. 537; Matter of Ahern v. South Buffalo Ry. Co. 303 N. Y. 545, affd. 344 U. S. 367), I think this is one of those rare instances where the presumption should not be indulged. The key section involved herein is section 69-c of the Pari-Mutuel Revenue Law which imposes a tax of % of 1% on all off-track pari-mutuel bets and is to be paid from the retained percentage by the commission and each participating municipality and public benefit corporation. The retained percentage is 17% on harness races and 16% on running races and steeplechases (§ 69-c, subd. 1). In addition, from the retained percentages, the expenses of operation and administration of off-track betting systems are to be paid (§ 69-c, subd. 3). Net revenues remaining after payment of all expenses is distributed in the following manner: (1) 80% to the participating municipality, (2) 20% to the general fund of the State treasury. If the net revenues exceed 200 million dollars, the breakdown is 50-50 on the excess over 200 million (§ 69-c, subd. 4).
Defendants-respondents rely upon Saratoga Harness Racing Assn. v. Agriculture & N. Y. State Horse Breeding Development Fund (22 N Y 2d 119 [Keating, J.]) as controlling on the question appellants raise concerning the distribution of revenue. In Saratoga, we held: “ [t]here is nothing in the amendment which requires that all revenue in excess of expenses be devoted to the direct support of government or which prohibits the Legislature, as a condition to granting a license to a private racing *223 association, from requiring that a certain portion of the revenues derived from racing be set aside for the general improvement of the sport and the facilities used.” (22 N Y 2d, at pp. 122-123). Respondents would have us read Saratoga as holding that the State may constitutionally share pari-mutuel revenue with other entities, a fortiori, local municipalities included. Saratoga merely required the racing associations to set aside some of their revenue to improve the facilities used, a proper legislative determination. Saratoga does not stand for the sweeping proposition which respondents contend, but rather, in my view, tends to support appellants’ position. It must be pointed out that in Saratoga, the Legislature in effect, reduced the track’s share of the ‘ ‘ breakage ’ ’ money so that the sport itself may have been improved. In addition, the allocation of the money was specifically delineated by the Legislature (§ 55-c; L. 1965, ch. 567). In the instant legislation, the Legislature has opened the door to numerous potential OTB systems (possibly as many as 62) without the State’s deriving a substantial amount of the revenue in violation of article I (§ 9). Article I (§ 9) mandates that it was to be State revenue to be derived from pari-mutuel betting*, hence, the instant legislation runs afoul of article VII (§7) of the State Constitution.
In essence, article VII (§7) requires that State funds must be paid out pursuant to an appropriation by law. Looking behind the present off-track betting enactment, the revenue derived from pari-mutuel betting is properly State money within the meaning of article VII (§7). The off-track betting statutes circumvent the requirement of appropriation by law and respondents ask us to take judicial notice that the State is merely a ‘ ‘ conduit ’ ’ through which moneys are transmitted back to local units for local purposes. It is no answer to say that local governments are creatures of the State and that the revenue raised is being used for public purposes. This argument ignores the plain language of the applicable constitutional provisions.
*224 The object of article VII (§ 7) is clear: “ to prevent the legislature from pledging the revenues for more than two years in advance, and compel them to review them every year, to ascertain what appropriation would be necessary ” (2 Lincoln, Constitutional History of New York, p. 184). Since the off-track betting statutes provide for disbursement of State funds without such appropriation, they contravene the constitutional controls envisaged by this provision. In effect, the off-track betting laws sanction the disbursement of large sums of State funds without the Legislature’s maintaining proper supervision of the moneys. This absence of State control over the revenue, in my view, vitiates the off-track betting system as presently operated.
Concluding that the off-track betting statutes are unconstitutional, it is not necessary to discuss the other arguments advanced by the appellants for reversal which I find have no merit.
Departing from the constitutional questions raised, there is the practical problem that validating the present off-track betting structure will have a deleterious effect on the racing industry in the State. This is due to the rippling effect which the proliferation of off-track betting systems will have on the racing industry in general. As attendance dwindles with the concomitant decline in admission and betting revenues, the tracks are compelled to maintain the quality of their 1969 program in order to obtain their statutory reimbursement. With escalating costs, the tracks will have less money to channel back into winning purses, thus, in the long run, making the New York tracks less attractive competitively. Dependent as the State is on the revenue for the support of State government obtained from racing, it is only necessary to note that prior to the enactment of off-track betting legislation, the owners of the stables and horses and the trainers threatened to withdraw from racing in New York State. It was only through the intervention of Governor Rockefeller, who assured them that purses would be improved, that they agreed to continue to race in New York. There is the ever-present threat that as track revenues plummet and purses are reduced, the best stables, horses, jockeys and industry personnel will no longer be racing in New York as New York will not be able to compete favorably with out-of-State tracks.
Of course, if off-track betting is completely controlled by the State, the State could see to it that there would be an equitable *225 apportionment between the racing industry and the State by adjusting the purses. Thus, the New York State racing industry’s continued viability will be fostered by a State take-over of the system. Such a take-over would be in the interests of the people of New York as it would ensure that the optimum amount of income able to be obtained from the coexistence of on-track betting and off-track betting would in fact be raised.
Accordingly, the judgment appealed from should be reversed and judgment entered declaring chapters 143,144 and 145 of the Laws of 1970 unconstitutional.

 Subsequent to the amendment authorizing pari-mutuel betting, three governmental committees studied article I (§ 9) and were of the opinion that only State revenue was to be produced. (See Select Bipartisan Committee on Off-Track Betting, N. Y. Legis. Doc., 1964, No. 32, p. 10; Joint Legislative Committee To Study All Laws, Rules and Regulations Relative To Horse Racing, Interim Report, N. Y. Legis. Doc., 1952, No. 49; 1941 Joint Committee to Study the Pari-Mutuel System, N. Y. Legis. Doc., 1941, No. 69.)